UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Verizon New England, Inc.**

    **v.**

**N.H. Public Utilities Commission,**
**et al.**

Case No. 05-cv-94-PB
**Opinion No. 2006 DNH 094**

## MEMORANDUM AND ORDER

Verizon New England, Inc. ("Verizon") challenges orders of

the New Hampshire Public Utilities Commission ("PUC") requiring

Verizon to provide its competitors with access to certain

elements of its network at rates determined by the PUC.  The

principal issue before me on cross-motions for summary judgment

is whether the PUC has the power to set the rates that Verizon

seeks to challenge.  Because the PUC has failed to offer a

satisfactory response to Verizon's contention that it lacks the

power to set the rates in question, I grant Verizon's motion and

deny the PUC's motion.

## I.  BACKGROUND

### A.  Regulatory framework

Congress passed the Telecommunications Act of 1996 (the

"Act"), Pub. L. No. 104-104, 110 Stat. 56, to promote competition

in the telecommunications market and end the former state-sanctioned monopolies on local telephone service. AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 371 (1999). The Act imposes certain duties on incumbent[1] local exchange carriers ("ILECs") such as Verizon[2] in order to facilitate competitors' entry into the market. Id. Among these duties is the obligation to allow competing carriers, known as competitive local exchange carriers ("CLECs"), to interconnect with an ILEC's established infrastructure. See 47 U.S.C. § 251(c).

The Act sets forth procedures through which carriers can enter the local and long-distance telephone markets. Sections 251 and 252 provide processes for CLECs to enter the local market by accessing portions of an ILEC's network. Section 271 requires descendants of the former AT&T monopoly (known as Bell operating companies or "BOCs") to obtain the FCC's approval to provide long-distance telephone service.

---

[1] A carrier is "incumbent" with respect to a service area if it provided telephone exchange service in that area when the Act took effect in 1996.

[2] Verizon is a successor to New England Telephone and Telegraph Company ("NET"), which was the local exchange carrier for most of New Hampshire when the Act became effective in 1996. NET was one of the telephone companies that spun off from AT&T Corporation in 1984.

## 1.  **Section 251 unbundling requirements**

Section 251 of the Act requires ILECs to provide unbundled access to certain elements of their networks, known as "unbundled network elements" ("UNEs").  47 U.S.C. § 251(c)(3); see 47 C.F.R. § 51.319 (specific unbundling requirements).[3]  The FCC alone has the authority to determine which network elements must be made available as UNEs.[4]  United States Telecom Ass'n v. FCC, 359 F.3d 554, 568 (D.C. Cir. 2004) ("USTA II") (holding that the FCC may not "delegate to state commissions the authority to determine whether CLECs are impaired without access to network elements").  In determining whether a network element must be provided on an unbundled basis, the FCC must consider whether an ILEC's failure to provide access to a non-proprietary element would "impair" a

---

[3] The specific elements at issue here are high-capacity interoffice transmission facilities ("IOF"), line sharing, dark fiber channel terminations and dark fiber feeder sub-loops.

[4] The FCC's early attempts to define which network elements must be unbundled were invalidated by the Supreme Court, see AT&T, 525 U.S. at 375, 387-92, and the U.S. Court of Appeals for the D.C. Circuit, United States Telecom Ass'n v. FCC, 290 F.3d 415 (D.C. Cir. 2002) ("USTA I").  The FCC's current unbundling requirements are set forth in its Triennial Review Order ("TRO"), Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 18 F.C.C.R. 16978 (2003), vacated in part by USTA II, 359 F. 3d 554, and the Triennial Review Remand Order ("TRRO"), Unbundled Access to Network Elements, 20 F.C.C.R. 2533 (2005).

CLEC's ability to compete, or, if the element is proprietary in nature, whether access to it is "necessary." 47 U.S.C. § 251(d)(2); 47 C.F.R. § 51.317.

Section 252 of the Act sets forth the processes through which CLECs can connect to an ILEC's network through interconnection agreements. If the carriers fail to negotiate an agreement, either party may ask the state commission to participate in the negotiation as a mediator or arbitrator. 47 U.S.C. §§ 252(a), (b). The state commission must approve all interconnection agreements before they are implemented, regardless of whether they are established through negotiation or arbitration.[5] Id. § 252(e)(1). A negotiated agreement can be rejected only on the grounds that it "discriminates against a telecommunications carrier not a party to the agreement" or its implementation "is not consistent with the public interest, convenience, and necessity." Id. § 252(e)(2)(A). An arbitrated agreement, in contrast, can be rejected if it fails to meet the FCC's unbundling requirements or pricing standards. Id. §

---

[5] The FCC can preempt the state commission's jurisdiction and assume responsibility for review of an interconnection agreement if the state commission fails to carry out its responsibility. 47 U.S.C. § 252(e)(5).

252(e)(2)(B).[6]

Determinations by a state commission of the "just and reasonable rate" for § 251 UNEs must be based on the cost of providing the network element, "without reference to a rate-of-return or other rate-based proceeding." Id. § 252(d)(1). The Act created "a hybrid jurisdictional scheme with the FCC setting a basic, default methodology for use in setting rates when carriers fail to agree, but leaving it to state utility commissions to set the actual rates." Verizon Communications Inc. v. FCC, 535 U.S. 467, 489 (2002); see also AT&T Corp., 525 U.S. at 385 (holding that the FCC has jurisdiction under § 201(b) of the Act to design a pricing methodology for § 251 UNEs). The FCC has determined that prices for § 251 UNEs must be based on the "total element long-run incremental cost" ("TELRIC") of providing the elements. See 47 C.F.R. § 51.505(b)(1). TELRIC essentially equates the value of an existing network "with the cost the [ILEC] would incur today if it built a local network that could provide all the services its current network provides

_____

[6] The state commission may also review interconnection agreements for compliance with state law, as long as it does not have the effect of "prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a); see id. § 252(e)(3).

-5-

. . . using the least-cost, most-efficient technology currently available."[7]  TRO, 18 F.C.C.R. at 17391-92, ¶ 669.

Under section 252(f), BOCs may fulfill their § 251 obligations by filing with the appropriate state commission a "statement of the terms and conditions that such company generally offers within that State," known as a Statement of Generally Available Terms ("SGAT").  47 U.S.C. § 252(f)(1).  The state commission must review the SGAT to determine whether it complies with § 251's unbundling requirements.[8]  Id. § 252(f)(2).  However, filing an SGAT does not relieve the BOC of its duty to negotiate interconnection agreements upon a CLEC's request.  Id. § 252(f)(5).  The state commission's authority to review the SGAT continues after the SGAT has taken effect.  Id. § 252(f)(4).

_____

[7] ILECs generally disfavor TELRIC pricing because it is a forward-looking methodology that does not take into account their actual investments in capital assets.  See Verizon, 535 U.S. at 496.  For a more complete discussion of historical and forward-looking pricing methodologies, see Jonathan E. Nuechterlein & Philip J. Weiser, Digital Crossroads, American Telecommunications Policy in the Internet Age app. A (2005).

[8] The state commission may also review an SGAT for compliance with state law, as long as it does not have the effect of prohibiting the carrier's ability to provide telecommunications services.  47 U.S.C. §§ 252(f)(2), 253(a).

## 2.  **Section 271 unbundling requirements**

Under the Act, ILECs that are former BOCs must apply to the FCC for approval to offer interstate[9] long-distance services.  47 U.S.C. § 271(d)(1).  To obtain § 271 approval, a BOC must demonstrate that it has either an approved interconnection agreement or an SGAT filed with the state commission.  Id. § 271(c)(2)(A).  The BOC must also comply with the "competitive checklist," which imposes unbundling requirements in addition to those required under § 251(c)(3).[10]  Id. § 271(c)(2)(B); see TRO, 18 F.C.C.R. at 17384, ¶ 652 ("BOCs have an independent obligation, under section 271(c)(2)(B), to provide access to certain network elements that are no longer subject to unbundling under section 251, and to do so at just and reasonable rates.").  Specifically, BOCs must provide access to "[l]ocal loop transmission from the central office to the customer's premises,

---

[9] The Act actually refers to interLATA (local access transport area) services.  47 U.S.C. § 271(a).  The terms "interstate" and "interLATA" may be used interchangeably when referring to the New Hampshire market because the state has only one LATA, which is roughly contiguous with the 603 area code.

[10] Section 271 approval is also contingent on compliance with § 272 of the Act, which provides "regulatory 'safeguards' to deter a BOC from leveraging its local market power into long-distance markets."  AT&T Corp. v. FCC, 369 F.3d 554, 557 (D.C. Cir. 2004).

unbundled from local switching or other services," "[l]ocal transport from the trunk side of a wireline local exchange carrier switch unbundled from switching or other services" and "[l]ocal switching unbundled from transport, local loop transmission, or other services." 47 U.S.C. §§ 271(c)(2)(B)(iv)-(vi).

State commissions have only a limited role in the § 271 application process. The FCC consults with the state commission to verify that a BOC has an approved interconnection agreement or SGAT that comports with the competitive checklist's requirements. Id. § 271(d)(2)(B). Although a state commission may recommend § 271 approval, the FCC ultimately has the authority to approve or reject a BOC's application. Id. § 271(d)(3). The FCC also has the authority to enforce the competitive checklist's requirements after a § 271 application is approved. Id. § 271(d)(6)(A); see BellSouth Telecomms., Inc. v. Miss. PSC, 368 F. Supp. 2d 557, 566 (S.D. Miss. 2005) (noting that "it is the prerogative of the FCC . . . to address any alleged failure by [a BOC] to satisfy any statutorily imposed conditions to its continued provision of long distance service"). If the FCC determines that a BOC no longer

meets § 271's requirements,[11] it may order the company to correct any deficiencies, impose a penalty, or suspend or revoke the BOC's § 271 approval.  47 U.S.C. § 271(d)(6)(A).

The FCC has determined that TELRIC pricing is not required for § 271 UNEs.  TRO, 18 F.C.C.R. at 17386, ¶ 656 ("TELRIC pricing for checklist network elements that have been removed from the list of section 251 UNEs is neither mandated by statute nor necessary to protect the public interest."); see also USTA II, 359 F.3d at 589.  Instead, prices must be based on the "just, reasonable, and nondiscriminatory rate standard . . . that has historically been applied under most federal and state statutes," as codified in §§ 201 and 202 of the Act.  TRO, 18 F.C.C.R. at 17389, ¶ 663.  Whether a particular rate satisfies this standard is a "fact-specific inquiry that the [FCC] will undertake in the context of a BOC's application . . . or in an enforcement proceeding brought pursuant to section 271(d)(6)."  Id. at 17389, ¶ 664.  One way a BOC might satisfy this standard with regard to a particular CLEC is by demonstrating that "it has entered into

_____

[11] The FCC has noted that the conditions for § 271 approval may change over time, consistent with changes in the law.  TRO, 18 F.C.C.R. at 17390, ¶ 665.

arms-length agreements with other, similarly situated purchasing carriers to provide the element at that rate." Id.

**B.   PUC Proceedings and Orders**

Verizon's predecessor filed an SGAT with the PUC in 1997, which was approved in part in 2001.[12] Bell Atlantic, Order No. 23,738, 86 N.H. PUC 419, 2001 WL 1002726 (July 6, 2001). The SGAT provided unbundled access to, among other elements, interoffice transmission facilities at DS1, DS3, STS-1, OC-3 and OC-12 speeds; the high-frequency portion of existing copper loops through line sharing arrangements; and dark fiber loops at existing spare facilities. NH SGAT §§ 5.3, 5.14, 5.16. The PUC's review of the SGAT included numerous hearings concerning the appropriate pricing for the offered UNEs. See Verizon New England Inc., 17 F.C.C.R. 18660, 18674-78 (2002) ("NH § 271 Order").

---

[12] Although the cover page of the SGAT stated that it was filed "under sections 251, 252 and 271 of the Telecommunications Act of 1996," see R. at 11, the PUC determined that the SGAT must be reviewed independently of § 271's requirements. The PUC noted that although the existence of an approved SGAT or interconnection agreement is a prerequisite to consideration of a § 271 application, "approval of an SGAT neither requires nor demonstrates proof that the SGAT functions in conformance with the § 271 competitive checklist." Pl.'s Mem. of Law in Supp. of Mot. Summ. J. Ex. 2 (PUC Order No. 23,738, dated July 6, 2001).

In July 2001, Verizon began the process of obtaining § 271 approval by formally asking the PUC to review its compliance with the Act's requirements. Id. at 18663. The PUC conditioned its recommendation for § 271 approval in part on Verizon's agreement to convert its SGAT into a wholesale tariff. Id. at 18663, ¶ 6; R. at 7. The tariff would allow CLECs to "directly order anything contained in the SGAT, without the need to negotiate an interconnection agreement." R. at 7. In a letter to the PUC dated June 5, 2002, Verizon agreed to "convert its Statement of Generally Available Terms (SGAT) to a tariff by year-end 2002 and incorporate the interconnection, UNE, and resale provisions of the SGAT into Tariff No. 84." Id. at 1. Verizon also agreed to "promptly file modifications to its SGAT and tariff to reflect changes in the services and network elements required by the Act, as determined by the FCC or the courts." Id. at 2.

The FCC, relying in part on the PUC's recommendation, approved Verizon's § 271 application in September 2002. NH § 271 Order at 18661-62, ¶¶ 1, 3. In reviewing Verizon's compliance with its § 251 unbundling obligations, the FCC found that despite "serious concerns as to whether the [PUC] applied the proper interpretation of the TELRIC methodology in its SGAT proceeding,"

-12-

Verizon's subsequent UNE rate reductions fell "within the range that a reasonable TELRIC-based rate proceeding would produce." Id. at 18683-84, ¶ 37. In a section entitled "Section 271(d)(6) Enforcement Authority," the FCC stated that it had "a responsibility not only to ensure that Verizon is in compliance with section 271 today, but also that it remains in compliance in the future." Id. at 18756-57, ¶ 172. It further stated that "cooperative state and federal oversight and enforcement can address any backsliding that may arise with respect to Verizon's entry into the New Hampshire" long-distance market. Id. at 18757, ¶ 174.

On December 19, 2002, Verizon filed an "illustrative" wholesale tariff that reflected the rates, terms and conditions of the SGAT. Am. Compl. ¶ 33. The tariff included a provision that allowed Verizon to discontinue, upon thirty days written notice, "the provision of any . . . service, facility, arrangement or benefit" to the extent permitted by "any judicial, regulatory or other governmental authority with jurisdiction over the subject matter." PUC Tariff No. 84, Part A, § 1.4.3.

## 1. TRO amendments

While Verizon's tariff was pending, the FCC issued the TRO,

which revised the prior unbundling rules that the FCC had set forth in its "UNE Remand Order," Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, 15 F.C.C.R. 3696 (1999). The FCC determined in the TRO that the § 251 impairment standard is met when "lack of access to an [ILEC] network element poses a barrier or barriers to entry, including operational and economic barriers, that are likely to make entry into a market uneconomic." TRO, 18 F.C.C.R. at 17035, ¶ 84. Accordingly, in making its unbundling determinations, the FCC considered "whether all potential revenues from entering a market exceed the costs of entry, taking into consideration any countervailing advantages that a new entrant may have." Id.

The FCC made multiple impairment findings with respect to dedicated interoffice transmission facilities ("IOF" or "dedicated transport") based upon their capacity level or speed.[13] See USTA II, 359 F.3d at 573. The FCC found that on a

---

[13] Dedicated IOF are "facilities dedicated to a particular competitive carrier that the carrier uses for transmission between or among [ILEC] central offices and tandem offices, and to connect its local network to the [ILEC]'s network." TRRO, 20 F.C.C.R. at 2576, ¶ 67. In the TRO, the FCC excluded entrance facilities, which connect ILEC and CLEC locations, from its definition of dedicated transport. See TRO, 18 F.C.C.R. at 17203, ¶ 366 (defining dedicated transport to include only "transmission facilities between incumbent LEC switches.") The USTA II court found that this ruling appeared to violate the

national level, CLECs are not impaired without unbundled access to high-capacity optical carrier level ("OCn") transport facilities.  TRO, 18 F.C.C.R. at 17200, ¶ 359.  With respect to DS1, DS3 and dark fiber transport,[14] the FCC found that CLECs are impaired without access to these facilities on a national level, despite the availability of alternatives in some locations.  Id. at 17226, ¶ 398.  Because the record before the FCC did not identify the locations of alternative facilities, the FCC delegated to the state commissions "a fact-finding role to determine on a route-specific basis where alternatives to the [ILEC's] networks exist such that competing carriers are no longer impaired."[15]  Id.

The FCC also eliminated line sharing[16] as a UNE based upon

_____

statutory definition of "network element" and remanded the matter to the FCC for further consideration.  USTA II, 359 F.3d at 586.

[14] Dark fiber is "fiber optic cable that has been deployed by a carrier but has not yet been activated through connections to optronics that 'light' it, and thereby render it capable of carrying communications.  Once activated, dark fiber transport is used by carriers for the same purposes as lit dedicated transport."  TRRO, 20 F.C.C.R. at 2607, ¶ 133 (footnote omitted).

[15] This delegation of authority to the states was reversed by USTA II, 359 F.3d at 574.

[16] Line sharing allows CLECs to provide digital subscriber line ("DSL") service over the high frequency portion of a copper loop while the ILEC uses the low frequency portion of the loop to

the availability of the entire copper loop as an unbundled element and the difficulty in allocating costs between portions of the loop. Id. at 17135-36, ¶¶ 260-63. In order to avoid disruption of DSL service to existing customers, the FCC temporarily grandfathered all existing line sharing arrangements as long as the CLEC continued to provide DSL service to the same end-user customer. Id. at 17137-38, ¶ 264. For new line sharing arrangements, the FCC established a three-year transition plan that allowed CLECs to access the high frequency portion of the loop at a gradually increasing percentage of established recurring rates "for stand-alone copper loops for that particular location." Id. at 17138, ¶ 265.

Verizon subsequently filed amendments to its SGAT eliminating the following elements as UNEs: (1) new orders for OC3, OC12 or STS1 interoffice transmission facilities ("IOF");[17] (2) new line sharing arrangements;[18] and (3) new orders for dark

_____

provide voice (telephone) service. TRO, 18 F.C.C.R. at 17132, ¶ 255.

[17] Existing OC3, OC12 and STS1 IOF would be discontinued on December 16, 2003, except as otherwise required under existing interconnection agreements. R. at 25.

[18] Existing line sharing arrangements would be grandfathered at existing rates for carriers that began providing DSL service to an end-user customer prior to October 2, 2003, and only for so

fiber between the CLEC's collocation arrangement and its central office or point of presence ("dark fiber channel terminations," a form of entrance facilities) and between the CLEC's collocation arrangement and outside plant remote terminal locations ("dark fiber feeder sub-loop").[19]  R. at 24-36.  The New Hampshire Office of the Consumer Advocate and several CLECs objected to the SGAT amendments.  See R. at 105 (NHISPA), 106 (BayRing), 111 (Revolution Networks), 149 (Great Works Internet), 150 (segTEL), 162 (Covad Communications), 188 (MCI), 204 (Conversent).

In January 2004, the PUC preliminarily approved Verizon's request to cease offering the IOF and dark fiber UNEs to new customers pending the outcome of the PUC's review of the revised SGAT.  Id. at 270.  The PUC denied Verizon's request to eliminate new line sharing arrangements and directed Verizon to continue accepting new orders for line sharing without requiring CLECs to negotiate separate agreements.  Id. at 271.  Verizon subsequently

_____

long as the carrier continues to provide DSL service to that customer at the same location.  R. at 27.

[19] Existing dark fiber channel termination and dark fiber feeder sub-loop arrangements would be discontinued on December 16, 2003, except as otherwise required under an effective interconnection agreement.  R. at 28.

filed revised SGAT pages that reflected the PUC's order.  Id. at 393.

On June 18, 2004, the PUC approved the terms of the wholesale tariff[20] that Verizon had filed in December 2002, which did not incorporate the TRO amendments.  Id. at 16-20 (PUC Order No. 24,337).  On January 28, 2005, Verizon filed revisions to the wholesale tariff to eliminate new orders for line sharing as of October 1, 2004.[21]  Id. at 337-38.  Orders placed between October 2, 2003 and October 1, 2004 would be priced in accordance with the TRO's transition rules and would be discontinued as of October 1, 2006.  Id. at 338-39.

## 2.  **TRRO amendments**

In February 2005, the FCC released the TRRO, which further refined the § 251 unbundling requirements for mass market switching, dedicated transport and high capacity loops.  TRRO, 20 F.C.C.R. at 2536-37, ¶ 5.  The FCC imposed "no section 251

---

[20] The PUC actually approved two tariffs: Tariff No. 84 is a "wholesale tariff of UNEs, interconnection and collocation available to CLECs;" Tariff No. 86 is a "resale tariff of retail products available at discount to CLECs."  R. at 398.

[21] The PUC combined the dockets for Verizon's line sharing amendments with segTEL's petition for an order directing Verizon to continue accepting new line sharing orders.  R. at 340.

unbundling requirement for mass market local circuit switching nationwide" based upon a finding that CLECs had "deployed a significant, growing number of their own switches . . . to serve the mass market in many areas." Id. at 2641, ¶ 199. The FCC adopted a transition plan that required CLECs to convert their local circuit switching customers to alternative arrangements within twelve months.[22] Id. The FCC also adopted transitional pricing set at "TELRIC plus one dollar." Id.

With respect to dedicated IOF, the FCC found that CLECs are not impaired without unbundled access to (1) DS1 transport on routes connecting a pair of wire centers, each of which contains at least four fiber-based collocators or at least 38,000 business lines, and (2) DS3 and dark fiber transport on routes connecting a pair of wire centers, each of which contains at least three fiber-based collocators or at least 24,000 business lines. Id. at 2575-76, ¶ 66. The FCC also found that CLECs are not impaired on a national level with respect to entrance facilities. Id. at 2610, ¶ 138.

---

[22] CLECs typically use local circuit switching in combination with ILEC loops and shared transport in an arrangement known as the unbundled network element platform ("UNE-P"). TRRO, 20 F.C.C.R. at 2642, ¶ 200. CLECs were thus required to transition their UNE-P customers to alternative arrangements within twelve months. Id. at 2641, ¶ 199.

With respect to high capacity loops, the FCC found that CLECs are not impaired without unbundled access to (1) DS1-capacity loops at any location within the service area of an ILEC wire center containing at least 60,000 business lines and at least four fiber-based collocators and (2) DS3-capacity loops at any location within the service area of a wire center containing at least 38,000 business lines and at least four fiber-based collocators. Id. at 2614, ¶ 146. The FCC also found that CLECs "are not impaired without access to unbundled dark fiber loops in any instance." Id.

The FCC adopted a twelve-month transition period for existing customers of DS1 and DS3 transport and loops and an eighteen-month transition period for dark fiber transport and loops. Id. at 2612, ¶ 142; 2639, ¶ 195. The FCC also imposed moderate price increases during the transition period that would help mitigate "the rate shock that could be suffered by [CLECs] if TELRIC pricing were immediately eliminated for these network elements." Id. at 2614, ¶ 145.

Verizon subsequently filed further tariff revisions to implement the TRRO unbundling rules, which took effect on March 11, 2005. R. at 552-79. The revisions eliminated access to mass

market local circuit switching, dark fiber loops, certain DS1 and DS3 loops, and certain DS1, DS3 and dark fiber dedicated transport as of the effective date of the TRRO. Id. at 552-55. Existing customers would be able to continue leasing the elements under the FCC's mandated transition periods and rates. Id. at 554.

### 3. PUC's § 271 unbundling orders

On March 11, 2005, the PUC issued an order denying Verizon's proposed TRO revisions to its SGAT and tariff. Id. at 390-443. After reviewing the TRO, TRRO and the NH § 271 order, the PUC determined that "Verizon remains obligated to have a wholesale tariff on file with our agency and an FCC decision to remove a UNE as a section 251 requirement does not automatically eliminate it as an unbundled element that Verizon must offer in its wholesale tariff." Id. at 431. The PUC concluded that it had "the authority to determine whether Verizon's wholesale tariff, including any changes proposed by Verizon, remains in compliance with the obligations Verizon voluntarily undertook in exchange for" § 271 approval.[23] Id. at 432. Although the PUC did not

---

[23] Verizon contested the PUC's authority to interpret or enforce § 271 requirements throughout the proceedings at issue here. See, e.g., R. at 123-24, 226-29, 342-58.

purport to "assert independent authority to define the scope of Verizon's section 271 obligations," it viewed itself as "the initial arbiter of disputes over whether Verizon continues to meet the specific commitments previously made to this Commission." Id. at 433.

The PUC then examined each of Verizon's proposed tariff revisions "in the context of the section 271 checklist, to determine whether Verizon remains obliged to offer them in its wholesale tariff." Id. The PUC found that checklist item four,[24] which requires BOCs to provide unbundled access to local loop transmission, encompasses all functionalities of the loop, including dark fiber feeder subloop and access to the high frequency portion of the loop through line sharing. Id. at 435-36. Likewise, the PUC found that checklist item five,[25] which requires BOCs to provide unbundled access to local transport, encompasses OCn and STS transport and dark fiber channel terminations. Id. at 438.

The PUC concluded that "Verizon must continue to provide line sharing, dark fiber feeder subloop, dark fiber channel

---

[24] 47 U.S.C. § 271(c)(2)(B)(iv).

[25] 47 U.S.C. § 271(c)(2)(B)(v).

terminations and IOF as part of its wholesale tariff," and, "if
and when Verizon files changes to rates under its wholesale
tariff, [the PUC] will review such proposed changes in the normal
course."[26]  Id. at 439, 441.  Until then, "Verizon shall offer
these section 271 elements at existing Tariff 84 rates."[27]  Id.
at 441.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

---

[26] The PUC also vacated its January 2004 decision that had
allowed Verizon to cease offering the IOF and dark fiber UNEs on
a temporary basis.  R. at 441.

[27] The PUC issued a subsequent order on April 22, 2005,
approving Verizon's tariff revisions with respect to mass market
local circuit switching and denying its amendments pertaining to
dark fiber loops.  R. at 808-09.  On March 10, 2006, the PUC
issued an order addressing wire centers at which Verizon is no
longer required to provision DS1 and DS3 loops and dedicated dark
fiber transport.  NH PUC Order No. 24,598, at 45.  Verizon
challenges that order to the extent that it is required to
continue offering de-listed elements through its wholesale tariff
at the FCC-prescribed transition rate of "TELRIC plus 15%."  See
id. at 46.  I refer collectively to the March 11, 2005, April 22,
2005, and March 10, 2006 orders as the "§ 271 unbundling orders."

56(c). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).

### III. ANALYSIS

Verizon argues that the PUC's § 271 unbundling orders are invalid to the extent that they require Verizon to submit its § 271 UNE rates to the PUC for approval. According to Verizon, the PUC lacks the power to set its § 271 UNE rates because Verizon's obligation to offer the UNEs stems exclusively from § 271, which grants primary oversight responsibility for § 271 UNE rates to the FCC rather than the PUC.

The PUC does not claim that federal law authorizes it to set § 271 UNE rates.[28] Nor has it made a developed argument that its

---

[28] The PUC claimed in its § 271 unbundling orders that the FCC's order approving Verizon's § 271 application delegated to the PUC the power to determine whether Verizon remains in compliance with its § 271 obligations. R. at 431-33. Contrary to the PUC's argument, the FCC's order does not delegate any oversight authority to the PUC, nor does it alter the PUC's limited consultative role under § 271. NH § 271 Order, 17 F.C.C.R. at 18757, ¶ 174. In any event, the PUC made only a passing reference to the FCC's order in its brief, see PUC's Br.

rate setting power is derived from state law.[29]  Instead, it

argues only that Verizon is estopped from challenging its

authority to set § 271 UNE rates because Verizon allegedly agreed

_____

at 19, and did not claim during oral argument on the summary
judgment motions that the FCC delegated its § 271 rate-setting
responsibility to the PUC.  Accordingly, the PUC has waived any
argument that it might have made that the PUC was acting pursuant
to a delegation of power by the FCC.

     [29]  Judge Carter recently concluded in a similar case that
Maine law gives that state's PUC the power to set § 271 UNE
rates.  Verizon New Eng., Inc. v. Me. PUC, Civil No. 05-53-B-C,
2006 WL 2007655, at *2 (D. Me. July 18, 2006).  Unlike the Maine
PUC, however, the New Hampshire PUC did not claim when it issued
the § 271 unbundling orders that it was acting pursuant to state
law.  R. at 439 n.13.  Nor did it argue in its summary judgment
brief that it was empowered by state law to set § 271 UNE rates.
PUC's Br. at 16-19.  During oral argument on the summary judgment
motions, the PUC's representative suggested for the first time
that the PUC's plenary authority under state law to regulate
intrastate network elements extends to § 271 UNEs.  Tr. at 57-62.
He did not explain his position, however, except to state in a
conclusory way that there is "a return of some state law
authority under Section 271 that may have been taken away from
[the PUC by] Section 251."  Id. at 61.  When I asked him for
textual support for his position, he responded that "my only
comeback to that would be that unfortunately this is a very
complicated regulatory regime that has been created through the
clash of competing policy imperatives and political forces, and
so some of this is less logical and coherent than either the
Court or the PUC would like it to be."  Id. at 62.  The PUC's
argument is difficult to understand because it presumes that
Congress conferred greater power on local PUCs to set § 271 UNE
rates than it did to set § 251 UNE rates, even though § 251
assigns express rate-setting responsibilities to local PUCs but §
271 does not.  In any event, I decline to consider this novel
argument because it has not been properly briefed.

to submit its § 271 UNE rates to the PUC for approval in exchange for the PUC's support of its § 271 application before the FCC.[30] I reject this argument because the undisputed evidence demonstrates that Verizon agreed to submit only its § 251 UNE rates for approval by the PUC. Because the UNEs in question are required under § 271 rather than § 251, Verizon's agreement does not grant the PUC the power it claims.

The only documents in the record that bear directly on this issue are Verizon's June 5, 2002 letter to the PUC and the PUC's June 14, 2002 response. Verizon's letter provides in pertinent part that

> Verizon NH will convert its Statement of
> Generally Available Terms ("SGAT") to a
> tariff by year-end 2002 and incorporate the
> interconnection, UNE, and resale provisions
> of the SGAT into Tariff No. 84. While the
> significant reorganization and reformatting
> effort is underway, Verizon NH will treat the
> existing SGAT like a tariff, making it
> available to all CLECs without the need to

---

[30] The PUC also argues that Verizon is collaterally estopped from obtaining a judgment in this case because it unsuccessfully litigated the same issues against the Maine PUC. I reject this argument. Collateral estoppel applies only where the issues to be determined in both cases are identical. Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 430 (1st Cir. 2005). In the Maine case, Judge Carter based his decision on a determination that Maine law gave that state's PUC the power to set § 271 UNE rates. Verizon New Eng., 2006 WL 2007655, at *2. Obviously, Judge Carter's ruling has no bearing on this case, which turns on other issues.

> enter [into] a specific agreement. Verizon
> NH will promptly file modifications to its
> SGAT and tariff to reflect changes in the
> services and network elements required by the
> Act, as determined by the FCC or the courts.
> Verizon NH also will continue to negotiate
> interconnection agreements with requesting
> carriers, in accordance with the Act.

R. at 1-2.[31] The PUC's response notes its decision to recommend

approval of Verizon's § 271 application by the FCC and describes

Verizon's agreement "to explicitly convert the existing SGAT into

a CLEC tariff from which competitors may directly order anything

contained in the SGAT, without the need to negotiate an

interconnection agreement." Id. at 7.

What these documents describe is merely an agreement by

Verizon to include rates in Tariff No. 84 for those UNEs that it

is obligated to make available to its competitors pursuant to §

251. We know this to be true because the only elements that

Verizon agreed to include in the tariff were the elements

identified in the SGAT. An SGAT contains "the terms and

conditions that [a BOC] generally offers within that State to

---

[31] Verizon also stated in the letter that it "reserves all rights to request modifications to its SGAT or the tariff . . . , such as seeking to cease providing or modifying new UNE-P combinations, as a result of a court or FCC decision that new combinations, or any individual UNE that the combination comprises, no longer are subject to the unbundling requirement." R. at 2-3.

comply with the requirements of section 251." 47 U.S.C. 252(f). An SGAT does not include elements that must be made available on an unbundled basis only pursuant to § 271. Moreover, as Verizon's June 5, 2002 letter to the PUC demonstrates, Verizon agreed to convert the SGAT into a tariff so that CLECs could "directly order anything contained in the SGAT, without the need to negotiate an interconnection agreement." R. at 7; see id. at 2. The tariff itself makes no reference to § 271 and instead states that it "sets forth the terms, conditions, and pricing under which . . . [Verizon] will provide access to unbundled network elements . . . consistent with Section 251 of the Act." Tariff No. 84, § 1.4.1(A) (emphasis added). Thus, the record in this case clearly demonstrates that Verizon agreed to include UNE rates in the tariff only to the extent that they were required under § 251.

Viewing the record as a whole, the PUC has failed to identify any persuasive evidence that supports its position that Verizon agreed to include § 271 UNEs in its wholesale tariff.[32]

_____

[32] The PUC points to the SGAT's cover page, which states that the document sets forth the "terms and conditions for . . . access to unbundled network elements . . . under sections 251, 252 and 271 of the Telecommunications Act of 1996." R. at 11 (emphasis added). This notation, which Verizon contends was made in error, is not sufficient to give rise to a triable issue as to

-28-

Because the PUC has failed to identify an alternative source for its power to set § 271 UNE rates, I agree with Verizon that the PUC lacks the power to set those rates.[33]

## IV.  CONCLUSION

Verizon's motion for summary judgment (Doc. No. 11) is granted and the PUC's motion for summary judgment (Doc. No. 12)

whether Verizon later agreed to tariff its § 271 unbundling obligations.

[33] The PUC's § 271 unbundling orders are invalid even if the PUC has the power to set § 271 UNE rates because it has used its purported power in a way that conflicts with federal law.  State actions are preempted by federal law "either when compliance with both state and federal regulations is impossible or when state law interposes an obstacle to the achievement of Congress's discernible objectives."  Grant's Dairy-Maine, LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res., 232 F.3d 8, 15 (1st Cir. 2000); see also Global NAPs, Inc. v. Verizon New England, Inc., 444 F.3d 59, 71 (1st Cir. 2006) (recognizing that federal agency actions may preempt conflicting state regulation).  Here, the PUC's § 271 unbundling orders, which require Verizon to make § 271 UNEs available to competitors at TELRIC rates, are in direct conflict with the FCC's determination that TELRIC pricing is not appropriate for § 271 UNEs.  See TRO, 18 F.C.C.R. at 17386, ¶ 656; id. at 17387, ¶ 659; UNE Remand Order, 15 F.C.C.R. at 3906, ¶ 473.  It is not an answer to this conflict preemption problem to argue, as the PUC does, that its orders do not conflict with federal law because they merely require the use of TELRIC rates on an interim basis.  PUC's Br. at 20-21.  The FCC established transition rates for de-listed UNEs in the TRO and the TRRO and the PUC's § 271 unbundling orders are in direct conflict with these orders.  Thus, the orders cannot stand even if the PUC has the limited authority to set § 271 UNE rates.

-29-

is denied.  The PUC is enjoined from enforcing its March 11, 2005, April 22, 2005, and March 10, 2006 Orders to the extent that they require Verizon to continue offering unbundled access to de-listed network elements through its wholesale tariff.  The clerk is instructed to enter judgment accordingly.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

August 22, 2006

cc:  Thomas J. Donovan, Esq.
     Daniel J. Mullen, Esq.